STATE OF MAINE
CUMBERLAND, ss

UNIFIED CRIMINAL DOCKET
No. CR-18-1278

STATE OF MAINE

STATE OF MAINE
Cumberland, SS. Clerk's Office

MAR 2 9 2019
RECEIVED

v.

ORDER

ANDREW WARREN,

Defendant

Before the court is a motion by defendant Andrew Warren to suppress evidence obtained during a motor vehicle stop on March 6, 2018, which led to the pending charge of Operating After Suspension for an OUI offense. A hearing on the motion was held on March 7, 2019.

The State has the burden of proving by a preponderance of the evidence that the stop of the vehicle driven by Warren was based on reasonable articulable suspicion and that the stop was not unduly prolonged.

The court makes the following findings of fact and conclusions of law.

1. On March 6, 2018 at about 10:30pm officer Todd Meslin and another Gorham police officer went to an apartment building located on Main Street in Gorham seeking Jacob Haskell, who was sought on an arrest warrant for forgery. Outside the building they encountered a man who identified himself as Paul Patriotti, accompanied by a woman who identified herself as Francesca Gallant. The officers spoke to Patriotti and Gallant, who indicated they were visiting a tenant in the building.

2. The nearest vehicle parked outside the building was a red van, and the officers ran the registration number of that vehicle and found it was registered to Andrew Warren

3. After Patriotti had entered the building and entered an upstairs apartment, Officer Meslin learned from the dispatcher that there was an active probation warrant for Patriotti. The officers then went in search of Patriotti but learned from the occupant of the apartment that Patriotti had fled out of the back of the building. Meslin could not remember whether Gallant was still in the building at that time, but at a later point it became apparent that she was no longer there as well.

4. Looking for Patriotti, the Gorham officers requested a K-9 unit, which followed a scent that led to Libby Avenue. The officers also ran a records check on Francesca Gallant and learned the make, model, color, and license plate number of a vehicle registered to her.

5. Approximately one-half hour later Officer Meslin and another Gorham officer, Sgt. Edwards, still looking for Patriotti and were in their vehicles watching Libby Avenue from Patio Park when they saw what appeared to be the vehicle registered to Gallant approaching along Libby Avenue.

6. This event is captured on video (with audio only of radio traffic) introduced as State's Ex. 1. As the car approached, the officers could not make out who was driving or whether there were any passengers. Once they confirmed that it was Gallant's vehicle, knowing that Gallant had accompanied Patriotti earlier, and believing that the car could contain Patriotti and/or Gallant, Sgt. Edwards turned on blue lights and stopped the vehicle.

7. When the officers approached the car, they found that it did not contain either Gallant or Patriotti. The only occupant was the driver, who produced a driver's license identifying himself as Andrew Warren, the defendant in this action and the person whose van had been parked outside the apartment building from which Patriotti had fled. Approximately 90 seconds later one of the officers can be heard on State's Ex. 1 apparently reading Andrew Warren's name and birthdate to

2

the dispatcher. Officer Meslin also looked up Warren's driver's license information on his computer.

8. During the course of the stop, Officer Meslin also asked Warren about Patriotti, about Gallant, and about Jacob Haskell,[1] but Warren was uncooperative and did not offer any information in response to those questions.

8. In checking Warren's driver's license, Meslin learned that Warren's right to operate had been suspended, and he then arrested Warren for operation after suspension. With the exception of a very short conversation between the officers about the possible connection between Warren and Patriotti and Gallant and Meslin's few brief attempts to question Warren about Patriotti and Gallant, the stop did not take any longer than required to check Warren's license. The stop generally did not exceed the normal time that it takes for an operator's driver's license to be checked.

9. From a review of the video, approximately seven minutes and 45 seconds elapsed between the time when the Gallant vehicle came to a stop and Warren's arrest for operating after suspension.

10. The Gorham officers had a reasonable articulable suspicion that justified their stop of the Gallant vehicle. This was because Gallant had accompanied Patriotti before he fled, because Gallant herself had left the building around the same time or shortly thereafter, and because the vehicle was in the same vicinity as the location to where the K9 unit had tracked a scent. Accordingly, the officers had a sufficient basis to conclude that the vehicle potentially contained Patriotti or that it contained Gallant, a person who potentially could provide information as to Patriotti's location.

---

[1] No evidence was offered, however, that there was any connection known to the officers between Jacob Haskell and defendant.

3

11. The remaining question is whether the stop of the Gallant vehicle driven by defendant was too prolonged. The defense argues that once the officers had ascertained that neither Patriotti nor Gallant were in the vehicle, they were not entitled to detain Warren for the seven plus minutes it took to ascertain that he was under suspension and arrest him.

12. The defense acknowledges that the Law Court has held that "[a]fter an officer stops a vehicle, he may request verification of the operator's right to drive, even when the original reason for the stop has disappeared. or evaporated, before the request is made." *State v. Gulick,* 2000 ME 170 ¶ 15, 759 A.2d 1085 (citations omitted). However, the defense argues that once Warren had shown that he had a driver's license, they should have allowed him to leave and that any further detention violated the Fourth Amendment.

13. The leading U.S. Supreme Court case with respect to whether a roadside stop has been too prolonged is *Rodriguez v. United States,* 135 S. Ct. 1609 (2015). However, in *Rodriguez* a records check had already been performed and a written warning issued before the detention was extended for a canine search. 135 S.Ct. at 1613. The *Rodriguez* decision states that after stopping a vehicle, officers may make "ordinary inquiries incident to the traffic stop" and that such inquiries typically involve "checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's insurance and proof of insurance." 135 S.Ct. at 1615. If officers are entitled to perform a records check for outstanding warrants, it follows that they are also entitled to perform a records check to determine whether a driver's license has been suspended.

14. There are several Law Court decisions that have upheld roadside detentions long enough to allow a records check on the driver even after the original reason for the stop had

4

evaporated. *See State v. Gulick,* 2000 ME 170 ¶¶ 5, 11, 19-20; *State v. Huether,* 2000 ME 59 ¶¶ 4, 8.

15. The defense argues that in each of those cases there was some reason why the officer in question had further suspicions.[2] One problem with this argument is that in *Huether* the Law Court expressly noted that the officer had performed a records check not because of any suspicion on his part but because it was his routine practice to do so. *See* 2000 ME 59 ¶¶ 4, 8 n.2.

16. Moreover, in *Gulick* the Law Court emphasized that running a records check was a "a minimal further intrusion" to serve the State's public safety interest in ensuring that only licensed drivers were on the road. 2000 ME 170 ¶ 20. In this connection, the court sees very little distinction between a records check undertaken when a driver does not have his license with him and a records check undertaken to determine whether a driver who produces his license is in fact authorized to drive.

17. The court therefore concludes that the State has met its burden of demonstrating that the length of the detention in this case was justified under *Gulick* and *Huether.* In this case the detention may have been slightly prolonged because, in addition to performing a records check, Officer Meslin questioned defendant about Patriotti and Gallant and the two officers discussed among themselves defendant's possible connection to Patriotti and Gallant. However, there was a reasonable articulable basis for that activity because defendant was driving Gallant's vehicle.

18. In the alternative, the length of the detention does not need to be reached in this case because the officers obtained all the information necessary to charge the defendant for operating after suspension once he identified himself and produced his driver's license during the initial moments of the stop. At that point, even if the officers had allowed the defendant to drive away

---

[2] The defense points out that in *Gulick* the operator of the vehicle had not been able to produce a driver's license and in *Huether* the operator had only produced a state identification card.

5

before performing a records check, they had all the information necessary to charge the defendant – they had learned his identity and they had observed that he was driving a motor vehicle. They did not obtain any other evidence as a result of the continuation of defendant's detention. The Gorham officers could have performed the records check (and discovered the suspension) whether or not the defendant was still being detained.

19. Defendant's motion to suppress is denied.

Dated: March 29, 2019

Thomas D. Warren
Justice, Superior Court